IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

LONG, D.
individually and on behalf
of all others similarly situated,

                       Case No. 15-cv-081

        Plaintiffs,

vs.

EPIC SYSTEMS CORPORATION

        Defendant.

## DECLARATION OF CHARLES BLACKBURN

I, Charles Blackburn, certify under penalty of perjury that the following is true and correct to the best of my knowledge and recollection:

1. I am an adult resident of the state of Wisconsin and am competent to testify regarding the matters set forth in this declaration.

2. I have reviewed the contents of this declaration and affirm that its contents are true, accurate, and based on my personal experience and observations.

3. I was employed by Epic Systems Corporation ("Epic") as a Technical Writer ("TW") from October 2012 through November 2014. I worked as a "support writer" on the "Ambulatory," "MyChart," "Haiku," and "Canto" software applications. My Team Leads ("TLs") were Megan Myers, Lindsey Berger, and Matt Becker.

4. My employment with Epic as a TW was my first full-time job after college. I graduated from the University of Georgia in 2010 with a Bachelor of Arts in English. I received a masters in Humanities from the University of Chicago in 2012. Prior to my employment with Epic, I had no experience in the information technology or software industries, and I had no prior exposure to or training in technical writing or computer programming.

5. During the hiring process, I took a personality test, a logic/problem solving test, and a writing evaluation. I was not evaluated in any aspect of my ability to work with computers or write computer code.

6. I do not recall that any prior experience in technical writing or working with computers was necessary to apply for the job. I had no prior experience.

7. During Epic's TW training process, I received no training in computer programming, coding, computer systems analysis, or software engineering. I attended the first week of training, "Epic 360," with all new hires and learned about the company and the healthcare industry generally. Then I completed "TW Boot Camp" with all new TWs. Boot Camp focused on Epic's internal tools used to write documents ("deliverables"). I also received training on grammar and style.

8. In addition to Boot Camp, I completed the application certification training for Ambulatory, the software application to which Epic assigned me. I attended application training in a classroom with other Epic employees. In application training I learned the functions of the Ambulatory software application and completed several projects.

9. I was paid a fixed salary during the entirety of my employment with Epic. I received no additional compensation for hours I worked over 40 per workweek. My starting salary of approximately $40,000 was raised to $42,000 after I received my certification in the Ambulatory application. By the time I left Epic, my salary was $50,000. I recall receiving two annual bonuses of approximately $2,000 and also a small Christmas cash bonus.

10. During my employment with Epic, I routinely worked in excess of 40 hours per workweek. I logged the time I worked into Epic's time log system.

11. My primary duty as an Epic Technical Writer was to produce or revise standardized documents that describe how Epic's software works, based on instructions and information provided by Epic's software developers, implementers, and trainers.

12. I used templates and Epic's Technical Communications Wiki (an intranet) to produce deliverables. Examples of common deliverables I produced include Release Notes and Setup and Support Guides. I produced these deliverables in "Cumulus," Epic's content management system. Cumulus had restrictions for each type of deliverable so that all of the documents were as consistent as possible. I also referenced the Wiki when I needed explanations of a particular section of a template.

13. As a TW, virtually all of the documents I produced had a template. If I did not follow the appropriate template for a particular deliverable, I would not

be allowed to publish my documents. For example, there was no way to send Release Notes to customers without using Cumulus.

14. In training, I, was instructed to adhere to Epic's writing standards, and I frequently received additional instructions at meetings regarding punctuation, capitalization, and style. I was discouraged from inserting my own ideas and creativity into deliverables. For example, the suggestions I made at several Release Note workshops were rejected. I was also asked by a TL to increase my release note volume and reduce the time I spent on other projects that interested me.

15. As a TW, all of my deliverables went through several tiers of review by other Epic employees, TWs, and an editing team.

16. As a TW, I did not have the authority or the ability to write code, access code, or fix a coding problem with the software. I was considered a "non-technical" employee; I never engaged in computer programming, computer systems analysis, or software engineering.

Dated: 5/16/16

Charles Blackburn