IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

**LEWIS, J.**
individually and on behalf
of all others similarly situated,

              Plaintiffs,

vs.

**EPIC SYSTEMS CORPORATION**

              Defendant.

Case No. 15-cv-082

---

## DECLARATION OF KAREN CAMPBELL

---

I, Karen Campbell, certify under penalty of perjury that the following is true and correct to the best of my knowledge and recollection:

1. I am an adult resident of the state of Wisconsin and am competent to testify regarding the matters set forth in this declaration.

2. I have reviewed this declaration and affirm that its contents are true, accurate, and based on my personal experience and observations.

3. I was employed by Epic Systems Corporation ("Epic") as a Technical Writer ("TW") from August 1, 2005 to May 6, 2015. I worked as a "support writer," an "implementation writer," and a "training writer" on the "ADT Prelude," "Cadence," "Referrals," "Tapestry," "Hospital Billing,"
"Hospital Outpatient," and "Resolute Professional Billing" software applications. My Team Leads ("TLs") for the last 3 years of my employment were Sarah Savage, Nikki McLaughlin, Peter Wiley, Maria Herro, and Kate Grimm.

4. My employment with Epic as a TW was my first full-time job after college. I graduated in May 2005 from Edgewood College with a Bachelor of Science in English.  Prior to my employment with Epic, I had no experience in the Information Technology or software industries, and I had no prior exposure to or training in technical writing or in any aspect of computer systems or programming.

5. During the hiring process, I completed a personality test, a writing sample, and a logic test based on a fake programming language.

6. I do not recall that any prior experience in technical writing or working with computers was necessary to apply for the job. I had no prior experience.

7. During Epic's TW training process, I received no training in computer programming, coding, systems analysis, or software engineering. I completed several courses regarding Epic's standardized documents ("deliverables") and was introduced to Epic's Content Management System ("Cumulus") and EMC2 Program. I also learned about Epic's Style Guide, which taught me the specific writing conventions required at Epic.

8. In addition to TW training, I completed application training for ADT Prelude, the team on which Epic placed me. This certification did not require that I learn to write code or program software.

9. I was paid a fixed salary during the entirety of my employment with Epic. I received no additional compensation for hours I worked over 40 per workweek. My starting salary of $32,000 was raised to $34,000 after I received my certification in the ADT Prelude application. When I left Epic, my salary was $66,500. I recall that I received a bonus each December totaling approximately 1-2% of my yearly salary.

10. During my employment with Epic, I routinely worked in excess of 40 hours per workweek. I used Epic's TLG system to log my time.

11. My primary duty as an Epic Technical Writer was to produce or revise standardized documents that describe how Epic's software works, based on instructions and information provided by Epic's software developers, implementers, and trainers. My primary duty was the same, regardless of the type of deliverable I worked on.

12. Examples of common deliverables I produced include implementation handbooks, release notes, setup and support guides, white papers, lesson plans, quick start guides, upgrade PowerPoints, strategy handbooks, and implementation handbooks. I used templates, most of which were found in Cumulus, to produce these deliverables. During the last 3 years of my employment, I recall producing only one deliverable that did not yet have a predefined template. That deliverable's template was eventually finalized.

13. In addition to Epic's templates, I used the Technical Communications Wiki (an intranet) to produce deliverables. The Wiki was the backbone of all my work as a TW. I looked to it for Epic's Style Guide and writing conventions, and for deliverable content and structure. The Wiki also laid out the process for producing each deliverable, how to get started, how to get review, etcetera.

14. In training, I was instructed to use Epic's templates and adhere to Epic's writing standards. Standardization and consistency of documents was important because Epic is a large company. When I suggested changes to certain training documents to make them user friendly, I was told by Matt Becker that I could not modify these documents.

15. As a TW, my work was reviewed by developers, other TWs, and/or an editing team. For example, Release Notes went through a regimented review process in EMC2 where different Epic employees signed off on the note before it could move forward to the next step of review.

16. As a TW, I did not have the authority or the ability to write code, access code, or fix a coding problem with the software. I was considered a "non-technical" employee; I never engaged in computer programming, systems analysis, or software engineering.

Dated: 7/13/2016

*Karen Campbell* (signature)

Karen Campbell

00362187.DOCX